TINKHAM and others *v.* TAPSCOTT and another.

The act (*ch.* 405 *of* 1857 ) to reorganize the wardens' office of the port of New-York is constitutional. The fact that the duties of the wardens involve the examination of vessels and cargoes does not bring their office within the meaning or policy of the constitutional prohibition against creating any offices for the inspection, weighing, &c., of merchandize. The prohibition is against public officers for testing the quantity and quality of articles with a view to the security of traffic in them.

The object of the act is to provide competent and independent officers to collect and perpetuate testimony in respect to the condition, &c., of vessels and their cargoes, for the guidance of parties interested, so far as they may voluntarily act thereupon, or may be justified or required so to do by the law governing the case; but the act does not give any effect to such testimony as evidence.

It is a violation of the act for any other than the port wardens to perform any of the duties prescribed for them thereby, although the port wardens have not been requested to act in the case.

The act does not prohibit any person interested in a vessel or cargo from procuring an examination thereof, for his own information or benefit, by any agent he may select.

Where, however, a firm, being the consignees and ship's husbands of a vessel and cargo in a damaged condition, procured persons not port wardens to make surveys and issue certificates thereof, and it was admitted that the services were "not exclusively for the information of the parties by whom they were procured, or of any one in particular for whom they acted as agents," and that the certificates were intended to perform, as the certificates of private persons not professing to be port wardens, an office like to that which would have been performed by certificates issued by the port wardens; *Held,* a violation of the law.

It is only where the general language of a prohibition leaves it doubtful whether a particular thing is embraced, that the exception of another thing of a similar kind, is to be construed as showing that the first was intended to be included.

APPEAL from a judgment of the Court of Common Pleas of the city and county of New-York. The action was commenced in June, 1857. The complaint states that the plaintiffs are partners, in the city of New-York, "in the occupation and business of making such examinations and surveys of ships and vessels and their cargoes" as are after-

wards mentioned, and in keeping an office for the making of such entries or records and the issuing of such certificates as are also afterwards mentioned; that their office is called The Marine Surveying office, and that they have been recommended to general confidence in that business, "under the name of marine surveyors, by the license, approval or appointment of the chamber of commerce and board of underwriters of said city;" and it states that the defendants are shipping merchants. It proceeds to state that on a day mentioned, which was subsequent to the passage of the act to organize the port wardens' office (*Laws of* 1857, *ch.* 405), the ship Middlesex arrived with a cargo of merchandize, at the port of New-York, from Liverpool, in distress, both ship and cargo being in a damaged condition on account of injuries sustained during the voyage; that she was owned and employed by persons other than her master, and that the cargo was the property of persons other than the master and owners of the ship; that the master was under a contract with the owners of the ship and other parties to proceed with her, after discharging this cargo in New-York, with another cargo and with passengers, to a foreign port. It then states that the defendants, being agents, consignees and ship-husbands of the ship, on the behalf of the master, whose agents they were, gave notice to the plaintiffs of the facts before mentioned, and requested them, by at least two of their number, to proceed, in the course of their said business, on board the ship, for the purpose of examining the condition and stowage of the cargo; and to inquire and ascertain the cause of the damage; and to make a memorandum thereof; and to enter the same in full upon the books of their office; and to furnish the master with a certificate of such record. It further stated that the ship was deemed unfit to proceed to sea on her intended voyage, and that the defendants notified the plaintiffs of her condition and requested them "to be surveyors of said ship on their behalf;" to survey and examine her, with the assistance of

Tinkham *v* Tapscott.

shipwrights, &c., by them to be called to their assistance, "and to judge of the repairs necessary to render her again seaworthy," &c., and to record an account of the survey in their books, and to furnish the master with a certificate thereof. It then alleged a performance by the plaintiffs of the service requested, the recording the surveys in the plaintiffs' books, with a statement of what repairs were necessary to make the vessel again seaworthy, and of what damage. had accrued, and the making, issuing and delivery of certificates of the survey of the ship and cargo, which service the plaintiffs alleged to be worth $58, and for that amount they demanded judgment.

The defendants' answer alleged that the surveys, examinations and records were not made exclusively for the information of the defendants, "or of any one in particular for whom they acted as agents," and insisted that the services performed by the plaintiffs exclusively belonged and appertained to the port wardens of the port of New-York pursuant to the act above mentioned. The answer also averred that the certificates of the survey made by the plaintiffs were intended to perform the office of the certificates of the port wardens under said act, and that the said services for which the plaintiffs claimed compensation were performed contrary to the laws of the state, and especially of the said act to reorganize the port wardens' office, passed April 14, 1857.

The plaintiffs demurred to the answer. The court, at special term, overruled the demurrer and gave judgment for the defendants; but this judgment was reversed on appeal to the general term, where judgment was given for the plaintiffs on the demurrer. The defendants appealed here.

*William C. Noyes* and *Samuel A. Foot*, for the appellants.

*Charles O'Conor* and *William Allen Butler*, for the respondents.

DENIO, J.   The plaintiffs' claim for compensation for these services is resisted on the ground that they were forbidden by law to perform them, and that it was likewise unlawful for the defendants to employ the plaintiffs to render such services.   By the act, the construction of which as well as its validity is in question in this case, the Board of Port Wardens created by it are declared to have " the exclusive right to perform all the duties of port wardens of the port of New-York," specified in the act.   It is also declared that they shall have " exclusive cognizance of all matters relating to the surveys of vessels and their cargoes arriving at the port of New-York in distress." (*Laws of* 1857, *ch.* 405, §§ 2, 3.)   The sixth section enacts that it shall be unlawful for any person except the port wardens appointed under the act, " to assume to act as port wardens, *or to undertake the performance of any of the duties prescribed*" in the act, " or pertaining to the said office of port warden," and also that " it shall be unlawful for any person or persons to employ any other than the legally appointed wardens for the performance of such duties."   All other persons are moreover forbidden to issue certificates of surveys on vessels " with the intent to defeat or avoid the provisions" of the act.

Unusual care thus appears to have been taken to prevent any interference by private persons with the duties and emoluments of the port wardens.   It is of course very plain that no cause of action can arise out of an act done in violation of a statute of the state.   The services for which compensation is claimed are the making of an examination and survey of a vessel which arrived at the port of New-York in distress, and of a damaged cargo which she brought, and making and entering a memorandum thereof, and giving a certificate of such entry.   The vessel was under a contract to take in a fresh cargo after unloading in New-York, and to proceed thence on a foreign voyage.   The services are precisely those which the port wardens are authorized and

Tinkham *v.* Tapscott.

required to perform, when called upon, by the third section of the act. But they are not bound, and I do not perceive that they are authorized, to perform these duties except "on being notified and requested" by some party in interest; and the pleadings do not allege that the services of the port wardens had been invoked in this case by any person. Upon this the position is taken by the defendants' counsel that inasmuch as the wardens could not act in the case for the want of a request on behalf of a party in interest, the plaintiffs might lawfully act, the prohibition extending as it is argued only to cases in which the wardens had a right to perform the service in consequence of a request to do so. Upon this construction, it would depend upon the will of the persons engaged in shipping business in New-York whether the functions in question should be performed by the official persons appointed to perform them or by private individuals, which is precisely what the legislature were determined to prevent. The act assumes what is no doubt the case, that the necessities of maritime commerce require these examinations and surveys to be made in certain cases, and that the results should be recorded and certified. It trusts to the wants of business men, and only provides that when required they should be done by persons acting under official responsibilities. Consignees and agents of ships and cargoes are free to dispense with surveys if they choose and so far as the public and the port wardens are concerned, but if they do resort to them they must employ a qualified person. To authorize the construction insisted on by the defendants, the act should have forbidden private persons to act only in cases where the port wardens were authorized to do so, but this is not the enactment. Other persons are not, under any circumstances, to undertake the performance of any of the duties prescribed by this act, or appertaining to the office of port warden, whether the wardens have been called on to perform it or not. The making of the survey, entry and certificate, for which the

plaintiffs claim payment, were duties prescribed by the act, and they appertained exclusively to the office of port warden by its express terms. The plaintiffs violated the law in attempting to perform them.

I do not doubt but that all the parties in interest in a vessel and cargo may resort to any agency which they may select to ascertain any fact relating to their property without violating this act. There is no positive exception in its language to meet such a case, except the provision that the officers are to act when called on ; but its plain intention is to provide for a summary determination, if applied for, in cases where the various parties interested are not on hand to unite, or where they may not agree upon questions requiring a speedy decision. I do not understand that the surveys and determinations of the wardens have any binding effect as judgments, or even as evidence. They prove the fact of a survey, but they do not establish the existence of the facts found by it. Their object is to settle the conditions of various marine contracts in which this agency is expressly or impliedly referred to, and to regulate the discretion of masters, agents and consignees, in emergencies which may arise. They also afford a convenient basis upon which to adjust damages in the settlement of such contracts, when the parties do not wish to resort to the courts; and when litigation becomes necessary, they point out where legal evidence can be obtained.

The qualifying words found in the sixth section, " with the intent to defeat or avoid the provisions of this act," relate only to the unauthorized signing of certificates of surveys. The insertion of them in the answer is not material, as the complaint itself describes the act done by the plaintiff in such a way as to show conclusively that it falls within the duties prescribed in the act as belonging to the port wardens to perform, and the act makes it unlawful for a private person to perform any of those duties, or any duties pertaining to the office of port warden, without regard to

the intent. It is therefore unnecessary critically to examine the answer, with a view to ascertain whether the allegations respecting the intent of the certificates issued by the plaintiffs come up to the expression in the statute.

The plaintiffs' counsel maintain that the provisions of the act to reorganize the wardens' office are such as the legislature was forbidden by the constitution to enact. The section referred to is as follows : " All offices for the weighing, measuring, culling or inspecting of any merchandise, produce, manufacture or commodity whatever, are hereby abolished ; and no such offices shall hereafter be created by law ; but nothing in this section contained shall abrogate any office created for the purpose of protecting the public health or the interests of the state in its property, revenue, tolls or purchases, or of supplying the people with correct standards of weights and measures, or shall prevent the creation of any office for such purpose hereafter." (*Art. 5,* § 8.) This restraint upon legislative power was, without doubt, suggested by, and was primarily aimed at, a system of laws which had grown up in this state, which required a very large class of the productions of the soil and of manufacture, and mechanical industry to undergo an inspection, or the determination, by weighing, measuring or gauging, of the quantity contained in the parcels in which they are usually sold, by public officers, preliminary to their being sold for the purpose of exportation, and, in regard to some articles, as a condition to being sold and trafficked in in the state. Almost every species of property which was extensively dealt in had been subjected to these regulations. The main features of the system were those which required the commodity to be submitted to the officers appointed for that purpose for inspection as to its quality, or for their determination as to the quantity contained in the several parcels, which were to be indicated by certain marks or brands, and which affixed penalties, and sometimes forfeitures, for the violation of the regulations prescribed. The officers were

compensated by fees, to be paid by the owners of the pro-
perty, and all private persons were forbidden to perform the
duties prescribed to the inspectors; and the imitating and
counterfeiting of the official brands was punished criminally.
(1 *R. S.*, 652–707, *3d ed.*) The officers created for the
execution of this system were numerous, and their legal
exactions were considerable in amount, and were com-
plained of as vexatious in practice. The legislature had so
far yielded to the public sentiment upon the subject that
about three years before the adoption of the constitution the
compulsory features of these statutes were repealed. The
corps of officers, however, remained, though it was at the
option of the persons interested to dispense with their
agency. (*Laws of* 1843, *ch*. 202.) The system might at any
time be reinstated by legislative authority, unless restrained
by the paramount law. In this condition the subject came
under the consideration of the constitutional convention of
1846, and, as we have seen, was totally abrogated and forbid-
den to be renewed. The provision is not limited to the repeal
of the then existing statutes and a declaration that they
shall not be reënacted. The system itself is condemned as
originating in a false and pernicious, or at least a mistaken
theory of political economy. Or, if the regulations were
supposed to be of any value, they were not considered suffi-
ciently important to outweigh the evil of maintaining the
host of officers which was required to execute them. Among
the mass of governmental powers there is not remaining
any authority to continue or reproduce a system in sub-
stance like this in its distinguishing characteristics, in any
form whatever.

We are then to determine whether the act under con-
sideration, in its essential features, is a part of the system
which has thus been abolished. In comparing them it will
be well to look at the objects sought to be accomplished by
each. The inspection laws, as I shall for convenience style
the enactments to which I have referred from the Revised

Statutes, assumed that dealers might be defrauded and that the credit of our productions and manufactures might be prejudiced in foreign markets without these regulations. It was supposed that the competition and rivalry which is found to exist among business men would not prevent the evil without the coöperation of the strong arm of the law. Hence, the dealing in uninspected articles was, under certain circumstances, prohibited. The end sought to be attained was, that dealers might purchase commodities without danger of being deceived as to their quality, and that inferior or damaged articles, or those of short weight or quantity, might not be sold in foreign markets to the disparagement of the domestic interests concerned in producing such articles. The duties of the port wardens do not call upon them to intervene at all between vendor and vendee. They are, upon request, to go on board vessels arriving in port with damaged goods, and inquire, examine and ascertain the cause of the damage, and enter it in their books. If a vessel arrive in port in a damaged condition, they are, in like manner, with the aid of nautical men, to ascertain and specify the damage, and make a similar record containing a particular account of it. If the vessel is considered unseaworthy, and is bound on a further voyage, they are to determine what repairs are necessary for the safety of the vessel and cargo on such intended voyage. When vessels come into port in distress, or are damaged while in the port, they are to determine whether the cargo is fit to be reshipped to its port of destination, or whether it ought to be sold for the benefit of whom it may concern ; and when there shall be a dispute about the value or measurement of a vessel, and perhaps when there is a question respecting the title, they are to make an estimate of such value or measurement and enter it in their books. Again, when damaged goods have been landed from a vessel, they are, if requested, to inquire, examine and ascertain the cause of the damage, and enter in their books a full and complete

statement thereof.  When condemned vessels or goods are
sold for the benefit of owners or underwriters, or on account
of whom it may concern, the sale is to be made by auction-
eers, under the orders and directions of the port wardens,
and the auctioneers are to render an account of these sales
to the wardens, who are, if required by the owner or con-
signee, to make an entry of the cause of the damage, the
amount of the sale, and the charges thereon.  These specific
acts, together with what may be implied from the language
which confers upon them "all the duties of port wardens,"
and which gives them "exclusive cognizance of all matters
relating to the surveys of vessels and their cargoes arriving
at the port of New-York, and the certifying of all official
entries made by them," comprise the aggregate of the public
functions of these officers.  They are to have certain fees,
which are to be paid by the persons employing them, and in
the case of the sale of damaged vessels and cargoes, they are
entitled to a commission of one-half of one per cent on the
amount of the sales.

With this view of the character of the inspection laws on
the one hand and of the functions of the port wardens under
the act in question on the other, we are in a condition to
determine whether the constitutional restriction applies to
the latter.  The question is whether the wardens hold office
for the weighing, measuring, culling or inspecting of mer-
chandize, produce, manufacture or other commodity in the
sense of the constitution.  I am of opinion that they do
not.  It does not establish the substantial identity of the
two classes of duties that the act of examination, which is
a synonyme for inspection, is common to both.  This is inci-
dent to all judgments which we are called upon to pass,
and to nearly all actions which it may be necessary to per-
form respecting external things.  A large proportion of the
functionaries whose offices are abolished are called "inspec-
tors" of particular things.  The name was given them for
convenience, and because the act of inspecting is a promi-

nent feature of their duties. But the convention did not intend to proscribe the act of examination, or to forbid all official agencies to which such an act was incident. They found that a system had prevailed under the acts of the state, by which many commodities were forbidden to be sold for exportation, and that some were forbidden to be sold at all without the allowance of a public officer; and they found a large number of offices established to execute this system. They abolished all these offices, and forbade the legislature to re-create them. There were at the same time laws in existence providing for the examination of damaged vessels and their cargoes, similar to those contained in the statute under consideration, but in some particulars less exclusive in their character. These laws provided for an examination of the vessels and cargoes, but for a totally different purpose than the one contemplated by the inspection laws, The latter were intended to protect and preserve the integrity of sales of merchandize and other personal property. The former looked to nothing of that kind. They had no reference whatever to any sale except that of damaged goods, or as to them the officers were to do nothing to affect the interests of buyer and seller. They were merely to ascertain and preserve the evidence as to the cause of the damage and the amount of the sales and the charges upon them for the benefit of absent parties. So as to their other duties. They consisted in the ascertainment of certain facts, and the pronouncing of certain opinions, of interest to parties who were not present to attend to their own concerns. Their design, and the intention of the present revised act, may be expressed to be to facilitate the adjustment of controversies between parties interested in maritime adventures, by means of examinations and entries made at the time and place, as near as may be, where the causes of such controversies occurred. There is scarcely anything in common in the scope and design of the two systems, and I am of opinion that the constitutional prohibi-

tion did not at all affect the legal provisions respecting marine surveys which existed when the constitution was adopted, and that it has no reference to the provisions contained in the act under examination. The cases which are excepted out of the prohibition and saved from its operation have been urged upon our attention as having a strong bearing upon its construction. It is no doubt a sound principle of interpretation that where there is a prohibition in general words, and a saving of particular things, there is a strong implication that what is excepted would have been within the prohibition if it had not been excepted; and thus the prohibitory words may be made more comprehensive than they would otherwise have been. (*Gibbons* v. *Ogden*, 9 *Wheat.*, 191; *Brown* v. *Maryland*, 12 *id.*, 438; *Vin. Abr.*, *Grants*, *H.*, 13, *p.* 61.) The case mentioned in *Viner*, from *Rolle's Reports*, is an example of this. It is there said that if there be a grant of all trees on a piece of land, which if nothing more had been said, would only have embraced forest trees, but there is an exception of apple trees, other fruit trees as peach and pear trees, will pass. This seems quite reasonable, but care must be taken not to carry the rule too far. It is matter of common experience that savings and exceptions are often introduced from abundant and even excessive caution, and it would sometimes prevent the intention of the author of the writing if every other thing of the same general nature as that excepted should be regarded as embraced in the general words. Something of this kind is, I think, observable in this provision. For instance, certain health officers are required by law to examine houses, lots and vessels, with a view to the discovery and removal of causes of sickness; but these officers could not reasonably be brought within the sense of this section if the saving clause had not been inserted. So there are officers charged with the custody of the standard weights and measures, who have certain duties to perform respecting them; but their places could not be properly

qualified as offices for the weighing and measuring of merchandize, produce, manufacture or other commodity, if there had been no exception respecting them. Similar remarks might be made concerning some of the other excepted cases. They obviously fall within the distinction I have suggested, of exceptions made from abundant caution. The correct statement of this rule of construction is, that where it would be equivocal upon the general language whether a particular thing was embraced, the exception of another thing of a similar kind will show that the first was intended to be included. The case in *Rolle* is a fair illustration of the rule as thus explained. The duties of the port wardens have no particular resemblance to those of the officers referred to in the exceptions, so that if the principle of construction was as broad as is claimed it would not prove the wardens to be included in the prohibition, unless indeed every official function to which the examination of property for any purpose is incident should be considered as within the purview of the section, which cannot with any reason be contended.

We are of the opinion that the provisions of the port wardens' act are not in conflict with the constitution of this state.

ROOSEVELT and PRATT, Js., dissented; COMSTOCK, J., expressed no opinion; all the other judges concurring,

Judgment reversed and judgment for defendants with costs.