# New York Marine Court.

*Trial Term—December*, 1878.

## EDWARD G. TINKEN, AS CAPTAIN OF THE PORT OF NEW YORK, *against* JOHN STILLWAGON.

**Powers of the captain and harbor-masters of the port of New York.**—The defendant was captain of the excursion steamer *J. B. Schuyler* and made landings at pier 55 East River, for which the Dock Department collected wharfage. The *Schuyler* is a vessel about 200 feet long, and the end of pier 55 is about fifty feet wide. Pier 55 is at the foot of Grand street, and pier 57 is at the foot of Broome Street. The space between piers 55 and 56 forms the slips of the New York and Brooklyn Ferry Co., which runs two lines of boats to and from this point. The slip had been used as a ferry terminus for nearly seventy years. On May 28, 1878, the president of the ferry company, complained to Harbor-master Thomson, that the landing of the *Schuyler* at pier 55 interfered with the running of the ferry-boats, and endangered the lives of the pasengers. Harbor-master Thomson investigated the complaint, and finding it to be true, ordered the defendant not to land at pier 55, and assigned the *Schuyler* a landing-place at pier 57, at the foot of Broome street. The defendant refused to obey the order of the harbor-master, and made a forcible landing at pier 55. *Held*, that the orders of the harbor-master were legal, and that defendant, by his refusal to obey the same, was liable to the statutory penalty of $50 ; that the statute under which the recovery is claimed, in so far as it establishes a harbor regulation, or creates a police or constabulary authority to prevent overcrowding and confusion and to facilitate equal rights among the

Tinken *v.* Stillwagon.

shipping in the harbor, is not in conflict with any provision of the constitution either of the S'ate or of the United States nor with any provision of Federal law.

The powers of harbor-masters defined.

Action to recover statutory penalty of $50.

*Beebe, Wilcox & Hobbs,* for plaintiff.

*Wm. H. McDougall,* for defendant.

McADAM, J.—This is an action, brought by the plaintiff, as captain of the port of New York, to recover a penalty of fifty dollars from the defendant, under section 7, chapter 487, of the Laws of 1862, as amended by chapter 586, of the Laws of 1865 (2 *R. S.* 6 ed. 186, 188). Section 1, of chapter 487, of the Laws of 1862, makes provision for the appointment of a captain of the port, and eleven harbor-masters, who shall be subordinate to him, and prescribes their qualifications. Section 2 provides, that the captain of the port shall divide the port of New York into eleven districts, and shall place one of the harbor-masters over each district. Section 7 provides, that "each harbor-master shall have power, within the district assigned to him, to provide and assign suitable accommodations for all ships and vessels, and regulate them in the stations they are to occupy at the wharves or in the stream, and to remove from time to time such vessels, as are not employed in receiving or discharging their cargoes to make room for such others as require to be more immediately accommodated for the purpose of receiving or discharging their cargoes ; and shall have power to determine as to the fact of their being fairly and in good faith employed in receiving or discharging their cargoes, and shall have authority to determine how far, and in what instance, it is the duty of the master and others having charge of ships and vessels to accommodate each other in their respective stations."

The section further provides, "And, if any master,

or other person having charge of a vessel, canal-boat, barge or lighter, shall refuse or neglect to remove his vessel, canal-boat, barge or lighter, when ordered to do so by the captain of the port, or by a harbor-master, or shall resist or forcibly oppose said officers in the discharge of their duties, such master or person so refusing, neglecting, resisting or opposing, shall, for every such offense, forfeit and pay the sum of fifty dollars, to be recovered with costs of suit, by and in the name of the captain of the port, before any court having cognizance thereof."

The defendant was on June 9, 1878, the pilot in charge of the steamboat *J. B. Schuyler*, a vessel theretofore engaged in carrying excursion parties from place to place in and about the city of New York, and on the day and occasion complained of was specially engaged in carrying excursion parties to and from Bridgeport, Connecticut. James M. Thomson was at the same time one of the harbor-masters of the port of New York, and was in charge of the district which included piers 55, 56 and 57, on the East river. Pier 55 is at the foot of Grand street, and pier 57 is at the foot of Broome street, and between 55 and 56 there are two short piers, which, together with the lower side of pier 56 and the upper side of pier 55, form the slips of the New York and Brooklyn Ferry Company, which runs two lines of boats to and from this point, the company being compelled by law to run a boat on one line once in eight minutes, and on the other once in twelve minutes. The slip has been used as a ferry terminus for nearly seventy years.

The steamboat *J. B. Schuyler* is a vessel about two hundred feet long, and the end of pier 55 is about fifty feet wide. Prior to June 9, 1878, the *Schuyler* had made a few landings on the end of pier 55, and on May 28 the president of the Ferry Company complained to Harbor-master Thomson that the excursion boats were

Tinken v. Stillwagon.

again landing at pier 55, and that such landing inter-
fered with the running of the ferry-boats and endan-
gered the lives of the passengers, and invoked his inter-
ference, whereupon, and on or about May 30, the har-
bor-master ordered the defendant not to land at pier
55, and assigned the *Schuyler* a landing-place at pier
57, at the foot of Broome street. When the *Schuyler*
was seen to approach pier 55, the harbor-master ordered
her away, and told those in charge to land her at pier
57, but the defendant declined to go to that pier, and
made a forcible landing at pier 55, and in that way re-
sisted and opposed the harbor-master in what the
plaintiff claims was the lawful discharge of his duties.

The evidence of experts proved that there is an
uncertain and "tricky" eddy tide in the vicinity of
the ferry slip and pier 55, which often forces the ferry-
boats, in going in or out of the slip, down against the
upper side of pier 55, and subjects them to collision in
case a vessel on the end of pier 55 overlaps the ferry
slip. The *Schuyler*, on account of her length (200 feet),
always overlapped the ferry slip more or less when she
landed on the end of pier 55, and on some occasions
prevented the ferry-boats from going in and out on
time. Such are the facts, and if it be determined, that
the acts of the harbor-master were legal, and that the
provisions of law, before cited, are of binding force and
are applicable to the case, it follows that the defendant
is liable for the statutory penalty. The law under
which the plaintiff seeks to recover, in so far as it
establishes a harbor regulation, or creates a police or
constabulary authority to prevent overcrowding and
confusion, and to facilitate equal rights among the
shipping in the harbor, is not in conflict with any pro-
vision of the constitution either of the State or of the
United States, nor with any provision of Federal law.
(Gibbons v. Ogden, 9 *Wheat.* 1; Cooley v. Port War-
dens, 12 *How. U. S.* 299; The New York v. Rea, 18 *Id.*

223 ; The James Gray *v.* The John Frazer, 21 *Id.* 184 ;
Welton *v.* State of Mo., 91 *U. S.* [1 *Otto*] 275 ; Chy
Lung *v.* Truman, 92 *Id.* 259 ; Neilson *v.* Gaeza, 2
*Woods C. Ct.* 287 ; Vanderbilt *v.* Adams, 7 *Cow.*
348 ; Benedict *v.* Vanderbilt, 25 *How. Pr.* 209).
These cases, although not involving a consideration of
the statute in question, discuss and consider how far
the States may go in enacting inspection, health,
quarantine, police and harbor regulations without con-
flicting with the Federal constitution (see also Tink-
ham *v.* Tapscott, 17 *N. Y.* 141; Vanderbilt *v.* Adams,
7 *Cow.* 349; Benedict *v.* Vanderbilt, 1 *Robt.* 194; S. C., 25
*How. Pr.* 209 ; Adams *v.* Farmer, 1 *E. D. Smith*, 588 ;
Mayor, &c. *v.* Tucker, 1 *Daly*, 107). The authority
of the harbor-masters has been upheld by the courts
in several cases.

Thus, in Adams *v.* Farmer, *supra*, the ruling was
that the power with which the harbor-master is invested
is a general one " to regulate and station," and is not
confined or limited to cases where other vessels require
more immediately to be accommodated in loading and
unloading. In Mayor *v.* Tucker (1 *Daly*, 107) the
ruling was, that the harbor-masters of the city of New
York have full power to station and regulate vessels in
the stream of the North and East rivers, and also
within the wharves of the city of New York. In Van-
derbilt *v.* Adams, (7 *Cow.* 348), the ruling was, that
the statutes authorizing the harbor-masters to regulate
and station vessels in the East and North rivers, ex-
tends to wharves in the hands of private owners, and is
not unconstitutional as interfering with private prop-
erty, but is valid as a police regulation.

These cases came under an earlier law than the act
of 1862, but it contained a grant of authority to the
harbor-masters similar to that contained in the present
law. The point made by the defendant, that the own-
ership of the pier in question (55) is in the municipal-

ity, and, that the Department of Docks had collected wharfage of the *Schuyler* for the use of the pier, on the ninth day of June, 1878, and that, therefore, the harbor-master had no control over it, is untenable. It is true that, by chapter 137, of the Laws of 1870, as amended by chapter 574, of the Laws of 1871, the rights which the city of New York had in the wharves, piers and bulkheads were conferred upon the Dock Department then created, and such Department was unauthorized to dedicate any such wharves or piers to special kinds of commerce (section 99, as amended by section 6, chap. 574, Laws of 1871). But, it is provided in subdivision 13, of section 6, of the same law: "That the provisions of this act relating to the Department of Docks . . . shall not affect the powers of the captain of the port and harbor-masters of the port of New York, or those of the port-wardens of the port of New York, as the same are now defined by law."

The collection of wharfage by the Dock Department for the use of pier 55 on the occasion complained of, and the license from that Department to land the *Schuyler* thereat, for the purpose of taking on and letting off passengers, was subject to the powers and lawful orders of the captain of the port and harbor-masters, and it is a mistake to suppose that such license placed the *Schuyler* and her officers beyond the jurisdiction of the captain of the port and harbor-masters.

In Mason *v.* Maginn, harbor-master, the superior court, special term, in October, 1877, entertained a bill for an injunction against the defendant upon these facts: Mason, the plaintiff, had leased from the Dock Department a pier at the foot of West Tenth street for a term of years, and, finding that a large number of produce vessels were desirous of using it, appropriated the pier to that kind of commerce, when the harbormaster of the district, fearing that such a use would interfere with the landing of steamers at that pier and

in the adjoining slips, ordered the produce boats not to land there, and assigned them other berths. Mason thereupon filed his bill of complaint, setting forth the facts. The injunction was refused, the court holding that the statute devolving certain powers and duties upon the captain of the port was in the nature of a constabulary or police regulation; that the power of the harbor-master extended to all vessels in port, as well those at the wharves as those in the stream; and that the power conferred on the dock commissioners to dedicate wharves and piers to special kinds of commerce is legislative, and could not be delegated; and, that a lessee has no right to so dedicate a pier; and, that, if it were so dedicated, the power of the harbor-master could still be exercised over it; and, that the authority of the harbor-master to regulate vessels in their stations is a discretionary power; and that its exercise cannot be questioned, except in the absence of all propriety or necessity. So that, if the license from the Dock Department, under which the *Schuyler* assumed to land at pier 55, be even treated as a dedication of the pier, it would nevertheless be subject to the jurisdiction and lawful orders of the captain of the port and the harbor-masters.

The defendant also contends that the aforesaid acts of the legislature do not refer to and comprehend an excursion steamer, liks the *Schuyler*, and cites the case of Lambert v. Staten Island Railroad Co. (70 *N. Y.* 104) to sustain such claim. In that case, Judge ANDREWS, in delivering the opinion of the court (on p. 110) says: "The regulation of the harbor-masters, to which we are referred, does not, by fair construction, having in view the authority possessed by them under the act (*L.* 1862, c. 487), in pursuance of which the regulations purport to have been made, apply to *small* boats, such as the sail-boat in question. The word *vessel* is used in the regulation, and in common par-

Tinken v. Stillwagon.

lance, small row-boats, or sail-boats, are not included
in this designation, and a reference to the act of 1862
will show that the powers conferred upon the harbor-
masters relate to the control of the wharves and piers,
and the regulation of vessels engaged in foreign and
domestic commerce, and tugs, barges and lighters.
We do not intend to define the limit of their powers,
but we are of opinion that the word *vessel*, in the
regulation, cannot be construed in its widest significa-
tion so as to include the small sail and row-boats which
throng the harbor of New York. '' The action above
referred to, was brought to recover damages for the
death of Charles Lambert, plaintiff's intestate, alleged
to have been caused by the defendant's negligence, in
permitting one of their ferry-boats the *Middlesex*, to
run into, capsize and sink, a small sail-boat, which the
intestate and another person were in at the time, and
which sail-boat was anchored at the time of the collis-
ion, at a point off Governor's Island.   Upon the trial,
the defendant's counsel requested the court to charge
the jury, '' that if they find that the said boat was an-
chored in a place prohibited by the regulations to be
used as a place of anchorage, and that its being so an-
chored contributed to the collision, they must find for
the defendant,'' and the remarks of Judge ANDREWS
were made with reference to the non-applicability to
small boats of the harbor-master's regulation in regard
to the anchorage of vessels.   It would have required a
great stretch of the imagination to have supposed that
these regulations applied to a small sail-boat, under the
circumstances described.   If the sail-boat had been in-
cumbering one of the city wharves, and had been of suf-
ficient size to endanger life, in consequence of the
unsuitableness of the pier and its proximity to ferry
slips, a different question would have been presented ;
for in my judgment the police or constabulary
authority conferred upon the captain of the port and

the harbor-masters, to prevent overcrowding and confusion and to facilitate equal rights among the shipping interests of this great commercial city, apply to all clases of vessels, whether large or small (Adams *v.* Farmer, 1 *E. D. Smith*, 588) and that the language employed in the act is to be accepted in its broadest signification to advance the object and purpose of the legislature in passing it, and in order to enable its remedial provisions to be made effective.

The defendant also claims that the *Schuyler* does not come within the class of vessels contemplated by the act of 1862, because it was not engaged at the time in foreign or domestic commerce. The act is not confined to vessels so employed, but applies to "all ships and vessels:" this is the language of the act itself (see *L.* 1862, c. 487, § 37). The *Schuyler* was, however, in contemplation of law, engaged in domestic commerce and intercourse at the time (Gibbons *v.* Ogden, 9 *Wheat.* 1; 3 *Kent Comm.* 1–21; *Webst. Dict.* tit. "Commerce;" *Worcester Dict.* same title). Under all the circumstances, I decide:

I. That it was improper for the *Schuyler*, in consequence of her length (200 feet), to land at pier 55, on account of its proximity to the ferry slips, and of the uncertain and tricky eddy tide in the vicinity, which had often forced the ferry-boats, going in or out of the slip, down against the upper side of pier 55, and made them liable to collide in case a vessel on the end of pier 55 overlapped the ferry slip as much as the *Schuyler* did in making her landings, which overlapping had on some occasions prevented the ferry-boats from running in and out on time.

II. That the pier assigned to the *Schuyler* by the harbor-master (pier 57) was suitable for said vessel, and as convenient a place to pier 55 as it was possible for the harbor-master to assign.

III. That the harbor-master, in the present case,

Tinken v. Stillwagon.

exercised his office without malice or oppression, and upon reasonable grounds and probable cause.

IV. That the authority possessed by the captain of the port and harbor-masters, under the act of 1862, is in the nature of police or constabulary powers.

V. That, by law, it is for them "to provide and assign suitable accommodations for all ships and vessels, and to regulate them in the stations they are to occupy at the wharves or in the stream."

VI. That, by law, it is left to them to determine whether the pier a vessel proposes to use is suitable or not, and, if they find and decide that it is unsuitable, they have the power to enforce their decision, and, whether such pier be public or private property, its use, by such vessel, even with the owner's license, is subject to the ordinary police and constabulary powers of the captain of the port and harbor-masters. *To this extent private* interests must yield to the public weal.

VII. That, in case the captain of the port or harbor-masters prevent the use, by such vessel, of the pier it proposes to use, upon the ground that it is unsuitable, they must provide and assign such vessel suitable accommodations elsewhere, and that, as a proper exercise of power, such accommodations ought to be as near as practicable to the pier first desired to be used, and to the requirements of the vessel, all of which was done in the present case.

VII. That the harbor-master's order, in this case, was a lawful exercise of power, and the defendant, by his refusal to yield obedience thereto, has incurred the statutory penalty of $50, for which judgment is hereby awarded against him, with costs.

### Foreign tonnage.

See cases collated in Wheeling, &c. Co. *v.* City of Wheeling (8 *Reporter*, 417) and in Howe Machine Co. *v.* Gage (9 *Reporter*, 769), denying the right of the State to regulate or impose duties upon foreign

tonnage. The State may, however, demand from a vessel a list of passengers, with their ages, places of birth, occupations, &c., because such requirement is a police regulation (11 *Pet.* 103). Local regulations of muncipal authorities of a seaport city prescribing where a vessel may lie in the harbor, how long she may remain there, what light she must show at night, and making other similar regulations, are not necessarily in conflict with any law of Congress regulating commerce, or with the general admiralty jurisdiction conferred on the courts of the United States, and may therefore be valid (The James Gray v. The John Fraser, 21 *How. U. S.* 184). Upon the subject generally see *Abbott's National Digest,* title " Commerce."