CHICAGO, R. I. & P. RY. CO. v. HANNIBAL & ST. J. R. CO.

(Circuit Court, N. D. Illinois, N. D.    April 23, 1901.)

No. 24,819.

CONTRACTS—CONSTRUCTION—TOLLS FOR USE OF RAILROAD BRIDGE.

The complainant acquired from defendant, by lease for a term of 25 years, the right to run its trains over some 50 miles of defendant's railroad track, and also the bridge owned by defendant across the Missouri river at Kansas City, together with the use of terminal facilities in the city. The lease provided for the payment of rentals for the use of the track and terminal property, and for the payment of tolls for passengers and freight transported over the bridge, in accordance with a schedule of rates therein contained; and further provided "that, if any other railroad company or common carrier shall, after the commencement of this lease, be permitted to transport freight or passengers over said bridge upon the payment of tolls lower than those above specified, the tolls above named shall be reduced to correspond with such reduced rates, but this proviso shall not apply to the existing contract between the party of the first part and the K. C., St. J. & C. B. Railroad Company." The latter company was then using the bridge under a contract requiring the payment of fixed annual rentals. Another company was also at the time running its trains over the bridge under a similar contract, which had just expired, but proceedings were pending before the governor for renewal, by reason of the failure of the parties to agree upon the terms, in accordance with a provision of the statute under which the bridge was constructed. Such renewal was made upon the same basis as before, requiring the payment of a fixed annual rental. The amounts paid as rentals under such contract were at all times smaller than the tolls paid by complainant, taking into consideration the number of trains run, and the passengers and freight transported, over the bridge by the respective companies, which facts were at all times known or accessible to complainant, which, however, continued to use the bridge, and to pay the stipulated tolls, without objection, for 18 years, when it made the claim that its tolls, both future and past, should be reduced to correspond with the amounts paid by the second company. *Held* that, inasmuch as the payments by complainant under its contract were to be made upon an entirely different basis from those under the other contracts, the one being determined by the amount of traffic, while the others were fixed without regard to the use made of the bridge, and in view of the practical construction placed upon the contract by the parties for so many years, the proviso for the reduction of tolls could not have been intended to apply to rentals paid by other companies under the other class of contracts, which would have required defendant to keep accounts, otherwise unnecessary, and which were not in fact kept, for

the purpose of reducing such rentals to a toll basis; and this notwithstanding the express exceptions from the proviso of one of such contracts, which must be presumed to have been inserted from an excess of caution.

## In Equity. On final hearing.

The bill of complaint is founded on a contract made December 4, 1879, whereby the Hannibal & St. Joseph Railroad Company, defendant (hereinafter mentioned as the "Hannibal Company") granted to the Chicago, Rock Island & Pacific Railway Company, complainant (hereinafter mentioned as the "Rock Island Company") the right to use for the term of 25 years (1) a section of 52 miles of its railroad, and (2) its bridge at Kansas City, with certain terminal facilities; and the relief sought is (1) an accounting to ascertain the rates of toll or compensation for which like use of the bridge has been granted to other railroads during the continuance of this contract; (2) to obtain a reduction of the complainant's rates, in conformity with a provision of the contract, to the alleged lower rates which have been accepted from such other companies; and (3) to recover the amounts paid by the complainant, in excess of such lower rates, during the intervening time, in ignorance of the reduced rates, and through the defendant's concealment of the facts. The controversy relates only to the bridge toll, although the terminal facilities in connection with that branch of the contract must be taken into the account. The provisions of the contract, so far as are material, are as follows:

"(1) A sum equal to 7 per centum on the valuation of $10,000 per mile, estimated to be one-half the value of fifty-one miles of railroad, the distance between Cameron Junction and Harlem; that is to say, a sum equal to 7 per centum upon $510,000.

"(2) A sum equal to one-half of all taxes legally assessed and levied upon the right of way, road, tracks, and station houses of the railroad hereby let and demised between Cameron Junction and Harlem, inclusive.

"(3) Tolls for all passengers and freight which the party of the second part shall transport over the railroad bridge of the party of the first part, at Kansas City, as follows:

| Articles. | Rates. |
|---|---|
| Merchandise | 5c. per 100 lbs. |
| Merchandise, car loads, 12,000 lbs. and over | $6 00 per car. |
| Carload Shipments: | |
| Cement, lime, railroad iron, salt, stucco, wood | $4 00 per car. |
| Brick, coal, hay, hogs, sand, stone, ties, and piling | $3 00 per car. |
| All freight not enumerated above | $5 00 per car. |
| Railway Equipment: | |
| Freight cars, as freight | $ 4 00 each. |
| Passenger coaches, as freight | $ 6 00 each. |
| Locomotive engines, as freight | $10 00 each. |
| For each passenger | 20 cents. |

"Provided, that if any other railroad company or common carrier shall, after the commencement of the term of this lease, be permitted to transport freight or passengers over said bridge upon the payment of tolls lower than those above specified, the tolls above named shall be reduced to correspond with such reduced rates; but this proviso shall not apply to the existing contract between the party of the first part and the Kansas City, St. Joseph and Council Bluffs Railroad Company.

"(4) A sum equal to the proportional share of expenses actually incurred in repairing, renewing, and maintaining the roadbed, tracks, and bridges (excluding the bridge over the Missouri river, and appurtenant structures), stations, buildings, water stations, and side tracks between Cameron Junction and Kansas City, inclusive, which share shall bear the same proportion to the whole amount expended for said purposes as the train miles run over said road by the lessee shall bear to the mileage of all trains operated thereon.

"(5) A sum equal to a proportional share of the expenses actually incurred in paying reasonable salaries to switchmen, telegraph operators, train dispatchers, and such other employés as may be employed in the performance of duties incident to the joint use and occupation of said railroad, as well as a like share of expense for water supply; the proportion of such share to be ascertained in the manner provided in the last paragraph.

"(6) A sum equal to the proportional share of all expenses incurred in switching cars (both passenger and freight) in Kansas City, and in the loading, unloading, and transfer of freight at the same place, which share shall bear the same proportion to the entire expenses incurred for such purposes which the number of cars switched, loaded, unloaded, and transferred for the party of the second part at said place shall bear to the whole number of cars which may be switched, loaded, unloaded, and transferred by the party of the first part at said point; but it is understood and agreed that each party shall pay in full all charges for trackage of its own cars out of the yard of the party of the first part in Kansas City.

"(7) A sum equal to 7 per centum of the amount expended in the construction of additional stalls in the engine house and tracks and freight houses and offices in the yard at Kansas City.

"(8) If the tolls for the use of the bridge of the party of the first part at Kansas City shall ever be reduced as provided in the third paragraph of this section, a reasonable rental, not exceeding the amount of such reduction, shall be paid by the party of the second part for the use of the yard of the party of the first part in Kansas City. If the amount of such rental cannot be agreed upon by the parties, it shall be fixed by reference, as provided in the seventh section of the third article hereof. Said rental shall be paid in monthly installments on the fifteenth day of the month following that in and for which it accrues, upon presentation of a statement by the party of the first part to the party of the second part showing the amount due, accompanied by copies of pay rolls and vouchers showing the payment of the expenses mentioned in the foregoing paragraphs numbered two (2), four (4), five (5), six (6), and seven (7), certified by the general manager or superintendent of the party of the first part."

And the Rock Island Company further agrees "to transport all passengers and freights which it can legally and legitimately control between Kansas City and points on its own line between Cameron and Chicago, inclusive, over the railroad which is hereby let and demised." Also that it "shall do no business as a carrier of freight or passengers to or from any point between Keystone (a station next west of Cameron) and Harlem, inclusive. It will give reasonable notice to prevent the entry of any passengers into its trains, and if, despite such notice, passengers do enter such trains, it will account for and pay to the party of the first part all fares which may be collected from them." The contract contained a further provision that it "shall be construed liberally, so as to protect and secure to each party the privileges and benefits herein provided or manifestly intended."

At the time this contract was made, the Kansas City, St. Joseph & Council Bluffs Railroad Company (hereinafter mentioned as the "Kansas City Company") was operating under a contract with the Hannibal Company, dated September 1, 1871, which granted to the former the use of the bridge, depot, and station grounds at Kansas City for 10 years for an annual payment of $20,000 in monthly installments; and such contract is mentioned in the proviso of the contract in controversy as excepted therefrom. This contract was subsequently renewed upon like terms. Moreover, the St. Louis, Kansas & Northern Railroad Company, subsequently known as the Wabash, St. Louis & Pacific Railroad Company, and later as the Wabash Railroad Company (hereinafter referred to as the "Wabash Company"), was operating its trains over the same bridge under a contract with the Hannibal Company made December 1, 1869, for a term of 10 years, providing for an annual payment therefor of $55,000. This contract expired on December 1, 1879, and, negotiations for renewal having failed, proceedings were then pending to fix the terms of renewal in accordance with the legislative grant under which the bridge was authorized; and the facts of such

prior contract and controversy over the terms of renewal were well known. The renewal was finally arranged through arbitration, and was made, by contract entered into June 1, 1880, to date from December 1, 1879, fixing the compensation at $48,000 per annum, payable in monthly installments, together with one-third of the expenses incurred by the Hannibal Company in maintaining the bridge. On September 1, 1888, this contract was modified so as to reduce the annual rental from $48,000 to $30,000, and the share of expenses for maintaining the bridge was changed to "a wheelage proportion," instead of "one-third thereof." The aggregate amount paid by the complainant each year under its contract for tolls largely exceeded the amount paid by the Wabash Company for the same period under either of its contracts, while the actual traffic of the Wabash Company over the bridge was of like class, and greatly exceeded that of the complainant. A dispute arose between the parties in 1886 respecting the rate upon lumber, but having reference only to an "equitable charge,"—whether it should be four dollars or five dollars,—and this remained an open question for several years, until a final adjustment was reached with no allusion to the present subject of controversy; and monthly settlements have continued throughout the term, aside from the pendency of that adjustment. The controversy in suit was initiated by a letter of Mr. Cable, president of the Rock Island Company, dated February 3, 1898, addressed to Mr. Perkins, president of the Hannibal Company, calling attention to information, which had then reached the company for the first time, that the Wabash Company had the use of the bridge at lower rates than those paid by the Rock Island Company, and asking for copies of the contracts with the Wabash Company, and statements showing the tolls, rentals, or charges paid by them for the freight and passengers actually carried. Such contract was thereupon furnished, and the following correspondence ensued; the letter of Mr. Cable bearing date February 28, 1898, and the reply by Mr. Perkins, March 8, 1898:

"Mr. C. E. Perkins, President H. & St. J. R. R. Co., Burlington, Ia.—Dear Sir: In response to my letter to you of the third instant, Mr. J. W. Blythe called on me at my office, and left with me copies of contracts between your company and the following companies, relating to the use of your bridge across the Missouri River at Kansas City: Wabash, St. Louis & Pacific R. R. Co., date June 1, 1880; modification of same, date Sept. 1, 1888; Kansas City, St. Jo. & Co. B. R. R. Co., date Sept. 1, 1871; same, date Sept. 1, 1881. Mr. Blythe suggested, without however definitely taking the position, that the proviso in paragraph 3 of section 1 of the contract between your company and this company, dated December 4, 1879, to the effect 'that, if any other railroad company or common carrier shall, after the commencement of the term of this lease, be permitted to transport freight or passengers over said bridge upon the payment of tolls lower than those above specified, the tolls above named shall be reduced to correspond with such reduced rates,' would not apply to the case of a contract such as those named, permitting another railroad company to transport freight and passengers over the bridge on the payment of a fixed annual rental, instead of on the payment of tolls, such as those specified in our contract. I cannot agree with this proposition. It certainly is not in accordance with the understanding with which the contract was entered into on our part, which was, to my recollection, that we were to have the right to use the bridge on as favorable terms as any other railroad company; the then existing contract with the Kansas City, St. Joseph and Council Bluffs R. R. Co. being excepted. Besides, Mr. Blythe's position has had the careful consideration of our legal department, and I am advised that our right, under the contract, to a reduction of the tolls provided for therein, cannot be affected by the circumstance that the tolls paid by the other companies for transporting freight and passengers over the bridge are paid in an agreed annual sum, instead of being computed on the basis of the amount of traffic over the bridge. A further suggestion made by Mr. Blythe, to the effect that the other contracts guarantied to your company fixed annual sums for the full terms of the contracts, does not seem to be strengthened by the provision in the Wabash contract of

June 1, 1880, for a readjustment of the compensation every five years; still less by the provision of the modified agreement of September 1, 1888, giving either party the right to terminate the contract on eighteen months' notice. It seems clear to me that we are entitled to a reduction of the tolls, under the terms of the contract, not only for the present and future, but also for the past. May I ask you again, therefore, to give me a statement of the amount of traffic, both freight and passenger, carried over the bridge each year during the term of our contract, by the Wabash Company and its predecessors under the contracts of June 1, 1880, and September 1, 1888, and by the Kansas City, St. Joseph & Council Bluffs R. R. Co. under the contract of September 1, 1881? Thanking you in advance for your compliance with this request, I remain,

"Yours, truly,                                    R. R. Cable, President."

"Mr. R. R. Cable, Prest. C., R. I. & P. Ry. Co., Chicago, Ill.—Dear Sir: I have delayed answering your favor of February 28th, about the bridge contract, in order to post myself more fully with regard to the facts. I am unable to comply with your request for statements of the traffic, for the reason, if there were no other, that no such statements have been made to or kept by the Hannibal Company, nor has that company in its possession data necessary for making them. It keeps accounts of cars and engines going over the bridge, but nothing more. This alone would seem to me to show that no such plan as the one you suggest for ascertaining the tolls your company should pay could have been made in the minds of the parties who made the agreement. The contract throughout carefully discriminates between the words 'tolls' and 'rentals,' and they are nowhere in it used as synonymous or interchangeable. There is not only no requirement that we should commute rentals paid by others into tolls, in order to find the measure for tolls to be paid by your company, but it is, to say the least, difficult to see how it could be done. To do it would certainly involve elaborate accounting for specific periods, and the tolls so ascertained could not be the same for any two periods. It is impossible to suppose that the parties to the contracts had any such plan in mind, and yet that they not only said nothing about it in the agreement, but went immediately to work, and gave a practical contemporaneous construction of an entirely different nature to the agreement they had made. Of course, if a rental contract is to be taken now as the measure of your tolls, it should have been taken as such in the beginning, when the parties who made it were in control to construe it. It seems to me perfectly clear that the parties understood from the beginning that tolls were not to be measured by fixed rentals. To adopt your construction of the contract would involve, first, finding out what the fixed rental paid by the Wabash would amount to in tolls, if that could be done, and then applying these tolls to your traffic, without any guaranty on your part to pay anything. I do not believe that the agreement can be so construed. I think, where one party pays a fixed, guarantied sum, and takes all the risks, and another pays tolls on the business which it actually transacts, leaving the lessor to take all risks, the circumstances differ so essentially as to make it impossible to find any adequate standard of comparison; and it seems to me plain that the parties who made the contract had this distinction clearly in mind, for the reason, as stated above, that they studiously discriminated between the words 'tolls' and 'rentals,' not once using them as meaning the same thing, and carefully abstained from providing for any of the elaborate machinery which would be necessary to carry out your idea. My conclusion is, and I am so advised, that you could not, as of right, demand statements of the business done by other roads over the bridge, even if we were able to furnish them.

"Yours, truly,                                    C. E. Perkins, President."

Other facts and circumstances affecting the issue are mentioned in the opinion.

Robert Mather and John S. Miller, for complainant.

Chester M. Dawes and J. W. Blythe (O. M. Spencer and John J. Herrick, of counsel), for defendant.

· SEAMAN, District Judge (after stating the facts). The contro-versy in this case is important, both for the amount involved and for the novelty of the single question presented, namely, whether the rate of tolls which the. Rock Island Company contracted to pay for the use of the bridge is governed by the subsequent grant to the Wabash Company of like use for a fixed annual rental. Solution of this inquiry depends upon an interpretation of the terms of the contract with the Rock Island Company for its use of the bridge, and to that end it is "the fundamental rule in the construction of all agreements" to ascertain what was "the substantial intent of the parties" in making the provision in question. Canal Co. v. Hill, 15 Wall. 94, 100, 21 L. Ed. 64, 67. The agreement is to pay "tolls for all passengers and freight" which the Rock Island Company "shall transport over the railroad bridge," in accordance with classification and rates therein specified, with this proviso however: "That if any other railroad company or common carrier, after the commencement of the term of this lease, be permitted to transport freight or passengers over said bridge upon the payment of tolls lower than those above specified, the tolls above named shall be reduced 'to correspond with such reduced rates; but this proviso shall not apply to the existing contract between the" Hannibal Company and the Kansas City Company. On the part of the complainant it is contended that the term "tolls" is here used in the sense of "compensation" for passage over the bridge; that, so considered, the proviso is applicable to any form of compensation for like privilege which may be adopted by the licensor, and thus embraces the ar- · rangement with the Wabash Company for a fixed annual sum or rental, and that the specific exception from the proviso of the existing annual rental contract with the Kansas City Company "shows conclusively that the parties used the words in that broad sense." If the sense in which the term was employed by these parties were ascertainable only from the language of the contract, unaided by the surrounding circumstances and conduct of the parties, these propositions would seem to be both tenable and decisive. But the word "tolls" is of flexible meaning, as indicated in the diversity of interpretation by the authorities cited in the briefs of counsel on one side and the other, according to the various circumstances under which it is used; and its interpretation as found in this contract cannot rest alone upon general definitions,—for instance, as "a tribute or custom paid for passage, not for carriage,"—but calls for an understanding of the circumstances attending its adoption to ascertain its meaning as adopted. In this view the exception from the proviso of the contract with the Kansas City Company fixing the compensation in gross at a yearly sum is an important factor for construing the general term under the well-settled rule that an exception so made strongly implies the understanding that such contract would otherwise be included, and raises a presumption that the term "tolls" was thus used· in the broad sense; but this is a rebuttable presumption, and must not override the true intention, if that appears from other legitimate evidence, as such clauses are often introduced from excessive caution, and for the

purpose of preventing a possible misinterpretation by including that which was not intended. Baggaley v. Iron Co., 33 C. C. A. 202, 90 Fed. 636; Tinkham v. Tapscott, 17 N. Y. 141. I am of opinion, therefore, that the language of the proviso requires other light for its interpretation, and that this is furnished through the well-recognized sources of explanation: (1) The circumstances under which the contract was entered into, and (2) the subsequent conduct of the parties by way of practical construction.

1. The bridge of the Hannibal Company was constructed under both state and congressional authority, and subject to the conditions imposed by the acts, respectively, that a right of passage be granted to the trains of other railroad companies when the roads or branches thereof terminated at or near the bridge, upon terms prescribed as follows: (1) By the state act, to be agreed upon between the parties, and, if they failed to agree, to be fixed by the governor of the state; (2) by the federal act, to be "for reasonable compensation." At the time the contract in suit was made, the Kansas City Company and the Wabash Company were running over the bridge under pre-existing contracts; but the contract of the last-mentioned company had expired by limitation four days previously, and proceedings were pending before the governor for renewal by reason of failure of the parties to fix the terms. The Rock Island Company had no terminus at the bridge, but was contemplating an extension to it, and by the arrangement in suit obtained such access over the Hannibal road for the intervening 52 miles, at an annual rental, together with the use of the bridge, under a separate provision, for tolls to be paid in accordance with schedule of rates. This method of providing compensation for the traffic over the bridge was obviously a radical departure from that of the prior contracts, as it involved no promise of an aggregate amount to be paid, or assumption of risk in the amount of business for any period during the long term of the contract. It was distinctively an arrangement on one side and the other that compensation should abide the actual volume of the business, thus sharing pro rata in the profitableness of the new traffic; and the testimony shows no such prior arrangement for the use of this bridge, but indicates that the plan and schedule were those of the toll system which prevailed at the neighboring railroad bridges of Atchison and Leavenworth. On the other hand, there was no such mutuality in the undertaking of the fixed rental contract. The amount was named in advance, was payable absolutely in monthly installments, without reference to the amount of traffic, and required no accounting for the business done. The two systems were distinct and well known, and the contract made choice of the one which was based on the extent of business. Construction of the proviso, therefore, rests on the choice of system, and not on the mere use of a word; the inquiry on the defendant's contention is not the narrow one stated in one of the briefs, whether the "proviso secures to the Rock Island nothing more substantial than an interest in the use of a word." If the Rock Island contract had stated the toll basis alone in its terms, with the Kansas City and Wabash contracts

then in the hands of the parties as arrangements to be continued on the fixed rental basis, but without mention of either in the new contract, it is probable that this distinction would have been deemed sufficient to show the true intention, and that the proviso for the reduction of the toll rate was not to be affected by the annual rental contracts or any bona fide renewals thereof made on a like basis. The difficulty, however, in the contract as made, arises from the fact that the Kansas City contract was expressly excepted from the proviso, while that of the Wabash Company was not mentioned. The testimony leaves no room for doubt that the parties to this agreement understood the character and status of the arrangement with the Wabash Company; that proceedings to enforce a renewal were pending, and that the right thereto upon reasonable terms was secured by the charter; and that they must have contemplated the continued use of the bridge by that company, subject only to readjustment of the terms. The contracting parties were railroad companies, entering into an important arrangement to continue for 25 years, and doubtless advised by able counsel. Why the contract thus prepared excepted the Kansas City contract from the proviso for reduction of rates, when it was not within the literal terms, and omitted mention of the Wabash situation of kindred nature, is unexplained; and so occurring in the face of the presumption which was liable to arise in such case, the circumstances attending the execution, taken alone in connection with the instrument, do not furnish satisfactory evidence of the intention of the proviso.

2. The potent element of practical construction by the parties remains for consideration, and I am of opinion that the testimony establishes a mutual understanding of the proviso which must be accepted as decisive of its meaning. This was my impression at the close of the oral arguments, but the importance of the issue and force of the contentions on behalf of the complainant have called for careful examination both of the testimony and the elaborate briefs submitted by counsel, and my deductions thereupon are summarized as follows: Operation under this contract has continued without interruption since the year 1879, with the tolls paid monthly in accordance with the schedule, and with no claim or suggestion at any time prior to 1898 that ground existed for reduction of the schedule rates on the basis of the proviso, or that the Wabash traffic was to be taken into consideration for that purpose. A single instance of dispute arose over the tolls fixed by the contract, and that related to rates which were "equitably chargeable" for shipment of lumber, and this remained an open question for years,— the Rock Island Company claiming that lumber was not specifically within the classification of the schedule for the five dollar rate asserted on the part of the Hannibal Company, and that a four dollar rate, which they were conceding, should be accepted as reasonable; and there is strong significance in the undisputed proof, by correspondence between both officers and attorneys, throughout the negotiations, extending from 1886 to the adjustment in 1893, that the claim of the Rock Island Company to the lower rate was predicated alone upon general equities, with no allusion to the provision upon

which the present claim hinges, and no suggestion that the company was entitled to any reduction of tolls within the specific terms of the contract. For 17 years the business was thus carried on under the toll basis of the schedule, with monthly accountings between the parties, and no testimony in the case tends to impeach the good faith of the defendant in acting upon such basis in the accountings; no conduct or efforts appear on the part of the defendant for concealing the arrangement with the Wabash Company, or the earnings of the bridge thereunder; and, so far as the evidence discloses, that transaction was ignored by both parties as foreign to their accountings. This course of conduct is utterly inconsistent with an understanding that the rates of toll were contingent upon the pro rata benefits derived by the Wabash Company under its contract as made, and, unless the complainant was excusably ignorant of the substantial facts of that transaction, it is obvious that its conduct and interests are not reconcilable with the view now asserted. For the inquiry thus remaining the test is not one of strict performance of a duty under the assumed construction, but whether sufficient information appears of a state of facts of such direct bearing and interest to the complainant, on the assumed construction, that its possession and the attending conduct are not consistent with an understanding of right to the reduction of tolls on the basis of the Wabash arrangement. In that view I am satisfied, from the undisputed testimony and circumstances, that the complainant is chargeable (1) with ample information of the nature and substantial terms of the Wabash contract, and (2) with information, which was both patent and in its hands, of the general excess of the Wabash traffic over its own across the bridge, while detailed information was readily obtainable, if not in its possession.

First. The Wabash contract was adjusted June 1, 1880, and readjusted September 1, 1888. The proceedings, final arbitration, and terms of adjustment were matters of notoriety in railroad circles. The substantial facts, including the terms as settled, were widely published in newspapers and railroad journals, of which extracts are in evidence,—several of the last-mentioned publications being received at the general offices of the Rock Island Company; and the exact terms were repeatedly stated in "Poor's Manual," a well-known publication of railroad statistics. Mr. Riddle was president of the Rock Island Company when its contract was made, and so continued until 1884. He signed the contract as such officer, and personally conducted much of the correspondence leading up to it, which is in evidence. He was requested to act as one of the arbitrators for the Wabash adjustment, and testimony of his conversation in the matter clearly indicated that he then had full information, and further conversations after the adjustment disclose that he was fully acquainted with the terms as settled. It is true that Mr. Cable (who subsequently became president) states that he was the assistant to Mr. Riddle, and was charged with the active work in arranging and carrying out the bridge contract; that he was not acquainted with the terms of the Wabash contract, and believes they were unknown to Mr. Riddle from the fact of their relations

in the office, and of no mention being made of its terms by him. But this mere inference can have no weight against the positive testimony of Mr. Easley and Col. Blodgett, and various corroborating circumstances, showing that Mr. Riddle had the knowledge; and this knowledge must be deemed that of the corporation, for the purposes of the present inquiry at least. So considered, it is of special importance for its bearing on the practical construction during the initial years of the contract, when the participants in the making were active in the performance. Furthermore, Mr. Withrow ·was general counsel of the Rock Island Company when the contract was made, had part in the making, and continued as counsel for several years thereafter. He was present when Mr. Riddle was discussing the Wabash arrangement, and was evidently acquainted with its features, both then and subsequently when he participated in the suggestive negotiations for settlement of the lumber-rate controversy between these parties. Other officers and agents of the Rock Island Company are shown to have had like knowledge at various times after the contracts were made; and during the same period annual reports were filed by each of the railroad companies with the railroad commissioners of Missouri and Iowa, as required by law, wherein the substantial terms of their respective contracts for use of the bridge at Kansas City were stated, including that of the Wabash Company; each being well known as a public record, and appearing annually in a publication which came to the general office of the complainant. On the evidence as a whole, information of the annual sum paid by the Wabash Company as an entirety for the use of the bridge was clearly within the possession of the complainant at the outset, and was constantly at hand thereafter.

Second. The volume of the Wabash traffic, generally speaking, was open to the constant observation of the officers and agents of the Rock Island, as a competitor for business, and a joint user of the bridge as well. Its excess over that of the Rock Island was well known to the officers of the latter, as disclosed by the testimony of Mr. Seger, Mr. Pickering, and Mr. Boynton, witnesses produced on its behalf; and their testimony shows that "statistical reports" were prepared from time to time, for the information of the Rock Island, in reference to competitive business, giving the aggregate of passengers and freight carried by each of the companies to and from Kansas City over this bridge, so that a comparative measure was constantly in the hands of the complainant. Moreover, from 1880 to 1895 the Rock Island and the Wabash were members of the "pool" called the "Southwestern Railway Rate Association," and Mr. Cable was the representative of the Rock Island therein throughout that period. Reports were made and furnished to the companies, showing the volume of the business of each company in "competitive territory," and included an exhibit of the business to and from Kansas City of each of the companies; such reports being made for the purpose of regulating their percentages in the "pool," and thus furnished a constant standard for comparing their respective volumes of business over the bridge. The tolls paid by,

the Rock Island in each year are stated in the bill at varying annual amounts, the minimum being $63,156 and the maximum $130,-603; and the potent fact appears that these payments were made in monthly installments, greatly exceeding in every instance the rate paid by the Wabash,—and this during the initial years when Mr. Riddle was in office,—showing that the tolls paid in September and October, 1880, were each nearly double the Wabash rate, and during 1882 and 1883 the excess was invariably more. than twofold. Competition for traffic exacts the utmost vigilance on the part of railroad managers, and a saving in fixed charges of this nature must have been regarded as an element of primary importance. With a standard in mind for reduction of the rates paid for bridge toll, and information so clearly open to that end, the reasonable inference is that the licensee would move for the reduction thus assumed to be his right, rather than keep up his excessive payments for years, to abide a tender of reduction and repayment on the part of the licensor; and surely this is the only reasonable course to be inferred from such view by the one party where the obligation of the other to make a reduction on the assumed basis is neither settled nor distinctly specified in the contract. The constant accountings between the parties under the circumstances shown, supplemented by their treatment of the single dispute over the lumber rate, lead to the conclusion that contracts for a fixed annual sum for the use of the bridge were not within the intention of the proviso; and, so interpreting the contract, the bill must be dismissed for want of equity, without passing upon other objections raised on behalf of the defendant. The decree will be entered accordingly.